# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 18-cv-1008-WJM-KLM

THE COLORADO COALITION FOR THE HOMELESS, a Colorado Nonprofit Corporation,

      Plaintiff,

v.

GENERAL SERVICES ADMINISTRATION, and
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

      Defendants.

---

## ORDER DENYING STAY OF AGENCY ACTION

---

      Plaintiff The Colorado Coalition for the Homeless ("Coalition") seeks review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, of a decision by Defendant United States Department of Health and Human Services ("HHS") denying the Coalition's application to assume control of a surplus piece of federal property and convert it into a location providing shelter and other services to the homeless. The Coalition also accuses Defendant General Services Administration ("GSA") of wrongfully participating in HHS's decisionmaking process, and of wrongfully beginning a public auction for the property in question. That auction is currently ongoing.

      To prevent the auction from reaching a conclusion and potentially putting the surplus property out of the Coalition's reach, the Coalition filed a Motion for Temporary Restraining Order and Preliminary Injunction ("TRO/PI Motion"). (ECF No. 9.) The

Court previously denied the TRO portion of this motion.  (*See* ECF No. 14.)  As to the PI

portion, the Court construes it, for reasons explained below, as a motion for stay of

agency action under 5 U.S.C. § 705.  So construed, the Court denies the Coalition's

motion for the reasons stated in this Order.

## I.  LEGAL STANDARD

The Coalition explicitly moves for a preliminary injunction under Federal Rule of

Civil Procedure 65.  (*See* ECF No. 9 at 1.)[1]  Because this case seeks review of agency

action under the APA, the proper authority for preliminary relief is 5 U.S.C. § 705:

> When an agency finds that justice so requires, it may
> postpone the effective date of action taken by it, pending
> judicial review.  On such conditions as may be required and
> to the extent necessary to prevent irreparable injury, the
> reviewing court . . . may issue all necessary and appropriate
> process to postpone the effective date of an agency action
> or to preserve status or rights pending conclusion of the
> review proceedings.

But the distinction between Rule 65 and § 705 is mostly technical because a § 705 stay

is a provisional remedy in the nature of a preliminary injunction, *see Winkler v. Andrus*,

614 F.2d 707, 709 (10th Cir. 1980), and its availability turns on the same four factors

considered under a traditional Rule 65 analysis, *see, e.g.*, *Hill Dermaceuticals, Inc. v.

U.S. Food & Drug Admin.*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007).[2]  Those factors are: (1) a

likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs

any harm to the non-moving party, and that (4) the injunction would not adversely affect

---

[1] Citations to ECF page numbers are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in exhibits.

[2] The major practical difference, it appears, between a Rule 65 proceeding and a § 705 proceeding is that Rule 65(c) requires a court granting an injunction to consider a bond amount, whereas § 705 contains no such requirement.

the public interest.  *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).  A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal.  *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010).

## II. STATUTORY BACKGROUND

In 1987, Congress enacted the Stewart B. McKinney Homeless Assistance Act, Pub. L. No. 100-77, 101 Stat. 482 (codified at 42 U.S.C. §§ 11301 *et seq.*) ("McKinney Act" or "Act").[3]  Title V of the Act (42 U.S.C. §§ 11411–12) requires federal agencies to consider regularly whether "excess," "surplus," "unutilized," or "underutilized" federal properties are "suitable for use to assist the homeless."  42 U.S.C. § 11411(a).  As amended, the Act assigns to the Department of Housing and Urban Development ("HUD") the responsibility to publish on its website a list of all excess, surplus, unutilized, and underutilized properties, and a list identifying which of those have been designated as suitable for homeless assistance.  *Id.* § 11411(c)(1)(A).

Upon such publication, a homeless assistance organization has thirty days to file a "written notice of intent to apply for such a property for use to assist the homeless."  *Id.* § 1141(b)(1)–(2).  Or, if a homeless assistance organization disputes a government agency's finding that a particular property is *not* suitable, the organization may file "for review of [the unsuitability] determination" within twenty days.  *Id.* § 1141(b)(3).

---

[3] In some court decisions, and in the Government's brief (*see* ECF No. 19 at 3), the long name of this enactment is given as the "McKinney-Vento Homeless Assistance Act," often shortened to the "McKinney-Vento Act."  The Court has thus far been unable to locate any Congressional pronouncement changing the name of the entire act.  A later-enacted addition to the McKinney Act was christened by Congress as the "McKinney-Vento Homeless Education Assistance Improvements Act," *see* Pub. L. No. 107-110, tit. X, §§ 1031–32, 115 Stat. 1989, but that refers specifically to the portions codified at 42 U.S.C. §§ 11431–35.

As to properties deemed suitable, the application process (after submitting a notice of intent) has recently changed. Until late 2016, the McKinney Act stated that a party seeking to take over federal property was required to "submit a complete application" to HHS within ninety days "after submission of written notice of intent to apply for a property." 42 U.S.C. § 11411(e)(2) (2012). HHS then had "25 days after receipt of a completed application" to decide whether to approve the application. *Id.* § 11411(e)(3).

In December 2016, Congress enacted the Federal Assets Sale and Transfer Act ("FAST Act"), Pub. L. No. 114-287, 130 Stat. 1463. Among other things, the FAST Act created a two-step application procedure. *See id.* § 22(4). Homeless assistance providers must now file an "initial application" within seventy-five days of the notice of intent. 42 U.S.C. § 11411(e)(2)(B). This initial application must focus on "the services that will be offered," "the need for the services," and "the experience of the applicant that demonstrates the ability to provide the services." *Id.* HHS must approve or disapprove the initial application within ten days. *Id.* § 11411(e)(3). If HHS approves, the applicant has forty-five days "in which to provide a final application that sets forth a reasonable plan to finance the approved program." *Id.* § 11411(e)(4). "No later than 15 days after receipt of the final application," HHS must "make a final determination." *Id.* § 11411(e)(5). The McKinney Act contains no provision for an administrative appeal of HHS's final determination.

### III.  FACTUAL & PROCEDURAL BACKGROUND

A.  **The Property**

The Denver Federal Center is a 670-acre site owned and managed by GSA in

Lakewood, Colorado.  The northwest corner of the Denver Federal Center comprises a vacant 59-acre parcel commonly known as Federal Center Station because it is immediately adjacent to a bus and light rail station also known as Federal Center Station.  To avoid confusion between the two "Federal Center Stations," the Court will refer to the 59-acre parcel simply as the Property.

In September 2016, HUD announced that the Property was surplus but GSA had found it unsuitable for homeless assistance purposes due to environmental concerns.  In May 2017, GSA announced that the Property would be put up for a public auction on July 25, 2017.  GSA's invitation for bids included documents that described the Property as suitable for a mixed-use development.

## B.    The Previous Lawsuit

On July 25, 2017—the date of the auction—the Coalition filed a lawsuit in this Court against GSA and HHS, claiming that GSA's unsuitability determination must have been arbitrary and capricious if the property was suitable for mixed-use development but not for assisting the homeless.  (*See* Case No. 17-cv-1797.)  That case was drawn to the undersigned.

The Coalition requested a temporary restraining order against the GSA auction, which the Court granted.  (*See id.*, ECF No. 21.)  This prompted the various federal agencies involved to look again at the Property, and they ultimately reversed the previous conclusion that the Property was unsuitable to assist the homeless.  (*See id.*, ECF No. 33 ¶ 1.)  The Court then granted Defendants' unopposed motion to dismiss the lawsuit as moot because "the specific injury complained of . . . (improper consideration of whether property is suitable for use by organizations seeking to alleviate

homelessness) has been remedied and is not likely to recur as to the property in question." (*Id.*, ECF No. 45.)

## C.    The Notice of Intent and the Application Packet

On October 6, 2017, the Coalition's president, Mr. John Parvensky,[4] submitted to HHS a letter of intent to apply for the Property.  On October 12, 2017, an HHS representative e-mailed Parvensky to acknowledge the Coalition's letter of intent, to provide application forms and instructions, and to establish deadlines.  (ECF No. 19-1 at 1–2.)  The HHS representative instructed Parvensky to "complete all items of the application packet, excluding items 4.(B), 4.(C), 4.(D) and 4.(E), which pertain to the applicant's proposed financial plan."  (*Id.* at 1.)  In other words, HHS's representative was following the FAST Act's mandate to review non-financial qualifications before seeking financial information.

The application instructions included the following warning:

> Applications determined incomplete will either result in a disapproval of the application or a request for additional information.  It is to the applicant's benefit to err on the side of providing too much information as opposed to omitting information or not providing enough detail.  It is the applicant's responsibility to ensure their application presents all the information requested in a detailed and complete manner.

(ECF No. 19-1 at 13.)

## D.    The Initial Application

### 1.    Submission, Clarification, and Approval

On December 21, 2017, Parvensky submitted the Coalition's initial application.

(ECF Nos. 9-1, 9-2, 9-3.)  The Coalition's proposed "Phase One" project was "a campus

---

[4] Parvensky is also the Coalition's attorney in this lawsuit.

of emergency shelter and transitional housing and services for homeless families and individuals using temporary structures constructed or placed on the site." (ECF No. 9-1 at 7.)[5]

On December 29, 2017, HHS sent Parvensky a letter requesting clarification or more specific information concerning numerous aspects of the initial application. (ECF No. 9-4.) Parvensky responded on January 12, 2018 (ECF No. 9-5), and HHS announced its initial approval in a letter to Parvensky dated January 23, 2018 (ECF No. 9-6). "Accordingly," said HHS, "the [Coalition] should move forward with the completion of Application Items 4B, 4C, 4D, and 4E related to the ability to finance the development and operation of the approved program of use." (*Id.*) The Coalition's deadline was March 9, 2018. (*Id.*)

    2.    <u>GSA's Input</u>

On January 26, 2018, HHS provided GSA with the Coalition's initial application. (ECF No. 9-7 at 1.) On February 14, 2018, GSA sent a letter to HHS claiming that certain assumptions or assertions in the Coalition's initial application were incorrect or "false." (*Id.* at 1–3.) HHS forwarded this letter to the Coalition on February 16, 2018 and asked for a response by April 1, 2018. (*See* ECF No. 9 at 9, ¶ 34.)

**E.    The "Reasonable Plan to Finance" Portion of the Application**

    1.    <u>The Coalition's Financial Plan</u>

On March 9, 2018, the Coalition submitted the portion of its application concerning ability to finance its proposed project. (ECF Nos. 9-8 through 9-11.) It estimated that the cost to develop the Property would be about $12.6 million,

---

[5] The Coalition also described plans for a later Phase Two involving permanent structures, but the Coalition was not seeking approval of that second phase.

comprising approximately $8.9 million for human-habitable structures and related development, and approximately $3.7 million for a solar farm that would sit atop a portion of the Property that is a capped landfill.  (ECF No. 9-8 at 14, 17.)

Concerning the $8.9 million needed for the human-habitable structures, the Coalition claimed it would obtain the funding as follows: $1 million committed from "development fees" earned by a Coalition subsidiary that builds low income housing projects; $3.05 million committed from the Coalition's existing funds; and $5 million committed from a projected $6.6 million profit that the Coalition expected to earn upon closing the sale of an apartment complex known as the Renaissance 88 Apartments. The sources, added together, came to a little over $9 million, and so would be more than enough to cover the $8.9 million estimated price tag of the proposed residential and administrative structures, and associated development (*e.g.*, utilities).  (*Id.* at 21.)

Concerning the $3.7 million needed for the solar farm, the Coalition announced that it expected to find a "tax credit equity investor" to invest about $1.3 million.  (*Id.* at 14.)  In other words, the Coalition was seeking an investor willing to contribute equity "in exchange for the solar tax credit benefits . . . and the tax benefits from depreciation." (*Id.*)  The Coalition announced that one of its consultants, an entity known as Resort Energy Ventures or "REV," had "discussed this project with a number of potential investors and ha[d] identified strong interest from multiple investors and lenders.  These include US Bank, Bank of America, Colorado Business Bank, [and] WGL Energy, a division of Washington Gas and Electric, a multibillion dollar capital source."  (*Id.* at 16 (emphasis removed).)

For the remaining $2.4 million needed to build the solar farm, the Coalition

described certain programs under which the local utility company and others in the community would buy excess solar power at a specified rate per kilowatt hour. The Coalition opined that the expected revenue from those sources would be enough to secure a bank loan for the needed $2.4 million. (*Id.* at 15.) Given that US Bank had loaned the Coalition $7 million "over the past five years," the Coalition stated that it was "confident that US Bank, or another investor" would provide a loan. (*Id.* at 16.) Later in the application the Coalition noted that it had not yet obtained a commitment for a bank loan, but REV assured the Coalition that there was "significant lender interest." (*Id.* at 22.) The Coalition estimated that it could "obtain such commitments within Sixty days of approval by HHS of [the] application." (*Id.*)

The application packet also required the Coalition to describe its plan for operating expenses on the Property. The Coalition estimated yearly operating expenses of about $2.7 million. (*Id.* at 20.) The Coalition also stated that its net revenue for 2015 was a little over $5 million; for 2016, about $16.7 million; and for 2017, just under $3.7 million. (*Id.* at 23.) Based on this three-year track record, the Coalition proposed that sustaining annual operational costs of $2.7 million would not pose a problem. (*Id.*) Thus, the Coalition "believe[d] that the ongoing cost of the Phase One operations can be absorbed by existing [Coalition] revenue sources without specific designation." (*Id.*) The Coalition also "project[ed] raising more than $25 million to support the initial Phase One and Phase Two components of the project," but provided no details to explain that projection. (*Id.*)

    2.    Response to GSA's Input

    On March 22, 2018, the Coalition responded to GSA's letter from the previous

month.  (ECF No. 9-12; *see also* Part III.D.2, above.)  The Coalition generally explained its reasons for believing that its assumptions and assertions were accurate.  (*See id.* at 1–8.)

### 3. HHS's Denial

By letter dated March 23, 2018, HHS announced its denial of the Coalition's application

> because [the Coalition] failed to meet threshold requirements related to [its] ability to finance the development and operation of the approved program of use.  More specifically, as detailed below, many aspects of the submitted financial plan are either incomplete or speculative and therefore fail to meet the requirements of 42 U.S.C. 11411(e)(4) and 45 C.F.R. 12a.9(b)(4).

(ECF No. 9-14 at 1.)

The first specific reason for denial was that the Coalition's estimated costs failed to include installation of a fire alarm system, and yearly operating costs for water.  (*Id.*)

The second specific reason for denial related to the $5 million pledged from the expected $6.6 million profit on the Renaissance 88 Apartments sale.  HHS noted that the document the Coalition attached to support this claim was a Purchase and Sale Agreement executed only by the seller, not by any buyer.  (*Id.*)  Moreover, HHS noted that the Coalition "'expects' . . . net receipts of $6,658,684," but the Coalition "did not provide documentation . . . indicating how much debt exists, how much will remain after debts are paid, and how net receipts would be distributed."  (*Id.*)

The third specific reason for denial related to the solar farm.  As to the tax credit equity investor, HHS noted that the Coalition "failed to provide documentation demonstrating commitment, or even interest, on the part of a specific lender [*sic*],

10

related to investing in this type of project." (*Id.* at 2.)  And, as to the bank loan, the

Coalition again "failed to provide documentation demonstrating commitment, or even

interest, on the part of a specific lender, related to providing financing for this type of

project." (*Id.*)  HHS also faulted the Coalition for failing to provide documentation

showing that it qualified for the utility company programs that would purchase excess

solar power at a specified rate.  (*Id.*)

The fourth specific reason for denial related to financing ongoing operations: "It

isn't clear why [the Coalition] would decline to designate specific funds in order to

demonstrate its ability to fund proposed operations. . . .  [T]he existence of net revenue,

in and of itself, is not indicative of [the Coalition's] ability to fund operations without

specific designation." (*Id.*)  And concerning the intent to raise $25 million, the Coalition

"did not provide any information demonstrating past success with similar capital

campaigns." (*Id.*)[6]

**F.      Reconsideration**

1.    <u>The Request</u>

On March 27, 2018, the Coalition sent a letter to HHS requesting

reconsideration.  (ECF No. 9-15.)  The Coalition's reconsideration arguments are

repeated, often verbatim, in its TRO/PI Motion to show a likelihood of success on the

merits, so the Court will address those arguments in that context, below (Part IV).  The

---

[6] The Coalition notes that, from January through March 2018, HHS received at least 90 letters from Lakewood residents, and from city and county officials, opposing the Coalition's proposed development.  (ECF No. 9 at 10, ¶ 37; ECF No. 9-13.)  The Coalition apparently insinuates that community opposition convinced the HHS decisionmaker (located in Maryland, *see* ECF No. 9-14 at 1) to manufacture a spurious reason to deny the Coalition's application. But the TRO/PI Motion does not actually make that argument.  The Court therefore will not explore it further.

11

following is nonetheless worth noting.

First, as to fire alarm expenses, the Coalition stated that HHS's application materials nowhere mentioned that a fire alarm system might be required, but the Coalition's contingency budget could cover the cost.  (*Id.* at 2.)  As for water expenses, "HHS is correct that we did not separately identify water service costs, this was inadvertent . . . .The $57,000 [line item] labeled as Trash should have been labeled as Trash and Utilities, including water."  (*Id.*)

Second, as to the partially executed Purchase and Sale Agreement for the Renaissance 88 Apartments, the Coalition stated that it "mistakenly attached the wrong PDF file" and it was now attaching "the fully executed purchase agreement."  (*Id.* at 2–3.)  Moreover, the Coalition provided an itemized breakdown of how the sale proceeds would be applied (*e.g.*, to existing debt), leading to the expected $6.6 million profit, from which $5 million could be pledged to the construction budget.  (*Id.* at 3.)

Third, concerning the Coalition's failure to explain how it expected to raise $25 million for ongoing operating costs, the Coalition pointed to four paragraphs from its *initial* application that described its annual budget of "approximately $55 million," its success in raising "more than $750 million over the past 25 years" for capital projects, and its success in raising "more than $250 million in operational funding over our 33 year history."  (*Id.* at 6.)  The Coalition explained that it "did not feel it necessary or appropriate to be redundant in repeating this information in the final application."  (*Id.*)

Finally, the Coalition also invoked a May 31, 2017 application from the City and County of San Francisco to take over vacant surplus federal property for purposes of assisting the homeless.  (*Id.* at 7.)  The Coalition noted that, on June 9, 2017, HHS

12

requested additional information and clarification on a number of questions answered by the City in its initial application, including answers to question 4(c) regarding operating costs for the proposed use, 4(d) requesting the various sources for capital operating and service costs, identification of the sources, if any, have been committed/awarded, and providing commitment/award letters.  The City of San Francisco was able to provide such additional documentation, and HHS approved its application.

We believe that the failure to allow CCH to provide additional documentation, while allowing other similar applicants to do so, is arbitrary and capricious. . . .

(*Id.* (citations omitted).)

      2.   <u>Denial</u>

HHS responded by letter dated April 3, 2018.  (ECF No. 9-16.)  It stated that

neither the McKinney Act nor relevant regulations provide for any appeal procedure.

(*Id.*)  Therefore, HHS's "disapproval determination is final and no further consideration

will be given."  (*Id.*)  It nonetheless went on to explain:

Approving a final application when an applicant has provided incomplete information, such as a partially executed document, or has failed to indicate that it relied on material contained in the initial application, for which a separate determination has already been made, would require [HHS] to make a determination based on assumptions and/or information not contained within the final application.  Given [HHS's] workload and the statutorily imposed [15-day] deadline for making such determinations, it is incumbent upon applicants to provide clear and complete information in the final application that demonstrates a reasonable likelihood of success in financing the development and operation of the proposed program of use.

(*Id.*)  As to San Francisco's recent application, HHS wrote that it "did not begin

implementing procedures under the FAST Act until late February of 2017, subsequent

to our providing an application to the City and County of San Francisco.  Accordingly,

we requested the completion of its application under the prior procedure."  (ECF No.

9-16 at 1.)

**G.      Current Proceedings**

The Coalition filed this lawsuit on April 30, 2018, announcing that GSA had put the Property up for auction as of April 2, 2018.  (ECF No. 1 ¶ 4.)  The Coalition filed its TRO/PI Motion on May 3, 2018, representing that the auction would close on July 17, 2018.  (ECF No. 9 at 33.)  Based on that representation, the Court found no alleged irreparable harm "so immediate that it must be addressed 'before the adverse party can be heard in opposition.'  Fed. R. Civ. P. 65(b)(1)(A)."  (ECF No. 14.)  The Court therefore denied the TRO portion of the TRO/PI Motion and established an accelerated briefing schedule for the PI portion.  Having received the parties' briefs, the PI portion of the motion, construed as a request for stay under 5 U.S.C. § 705, is now ripe for ruling.

## IV.  ANALYSIS: LIKELIHOOD OF SUCCESS

The Court finds that the Coalition has not shown a likelihood of success on the merits, and the Court therefore confines its analysis to that element of § 705 analysis.

**A.      Standard of Review on the Merits**

The APA empowers a reviewing court to set aside agency action if it is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Generally, an agency decision will be considered arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A reviewing court should engage in a "thorough, probing, in-depth review," *Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation omitted), with its review of the merits "generally limited to . . . the administrative record," *Custer Cnty. Action Assoc. v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001).

However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002) (stating that the court's review is "highly deferential"). The Court confines its review "to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006). "An agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious." *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1221 (10th Cir. 2009).

## B. Procedural Challenges

The Coalition enumerates fourteen allegedly separate ways in which HHS (and potentially GSA) acted arbitrarily and capriciously. (ECF No. 9 at 13–32.) These arguments can broadly be classified as either procedural or substantive. The Court will address the procedural arguments (nos. 1, 4, 9–14, and parts of 2 and 6) in this subsection, and the substantive arguments (nos. 3, 5, 7, 8, and the remainder of 2 and 6) in the following subsection (IV.C).

### 1. Review Standards

Arguments 1, 2, and 10 present various overlapping attacks on the standards by

which HHS reviewed and explained its decision.

a.    *Argument 1*

Argument 1 rests on the statement in HHS's March 23, 2018 denial letter that the Coalition's application "failed to meet threshold requirements."  (ECF No. 9 at 13–14 (quoting ECF No. 9-14 at 1); *see also* Part III.E.3, above.)  The Coalition argues that no statute, regulation, or other document (such as the application instructions) defines or lists any "threshold requirements."  (ECF No. 9 at 13–14.)

The Coalition is correct that the phrase "threshold requirements" does not appear in any of the cited authorities.  But this phrase is plainly just HHS's introductory shorthand.  Its very next sentence states, "More specifically, as detailed below, many aspects of the submitted financial plan are either incomplete or speculative and therefore fail to meet the requirements of 42 U.S.C. 11411(e)(4) and 45 C.F.R. 12a.9(b)(4)."  (ECF No. 9-14 at 1.)  The statutory citation is to the portion added by the FAST Act requiring "a reasonable plan to finance the approved program."  (*See* Part II, above.)  The regulatory citation reads as follows:

> Upon receipt of an expression of interest, [HHS] will send an application packet to the interested entity.  The application packet requires the applicant to provide certain information, including the following—
>
> * * *
>
> (4) Ability to finance and operate the proposed program. The applicant must specifically describe all anticipated costs and sources of funding for the proposed program.  The applicant must indicate that it can assume care, custody, and maintenance of the property and that it has the necessary funds or the ability to obtain such funds to carry out the approved program of use for the property.

45 C.F.R. § 12a.9(b).

Although the Coalition disagrees with HHS's application of these standards, it does not argue that these were the wrong standards. Thus, any argument that HHS erred by applying unspecified "threshold requirements" is meritless.

    b.    *Argument 2 (partial)*

Part of the Coalition's Argument 2 claims that HHS "fail[ed] to specifically detail how the [Coalition] failed to meet the statutory standard of providing a final application that sets forth [a] 'reasonable plan to finance the approved program.'" (ECF No. 9 at 15.) The Coalition points to no authority (statute, regulation, or case law) requiring specific detail. The only potentially relevant statute of which the Court is aware is the APA's general requirement that agencies explain denial decisions:

> Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

5 U.S.C. § 555(e). HHS's March 23, 2018 denial letter exceeds the standard with specific criticisms of the Coalition's final application. Accordingly, the Coalition's Argument 2 lacks merit.[7]

    c.    *Argument 10*

Argument 10 points to a different regulation governing the application process, which reads as follows:

---

[7] Argument 2 contains passing comments that HHS's regulations and application packet have not been changed to reflect the FAST Act. (ECF No. 9 at 15.) The Coalition does not make any argument based on these assertions. Moreover, except as discussed regarding Argument 10, below, the Court sees no inconsistency between the FAST Act on the one hand and the existing regulations or application materials on the other. The major change is that the financial portion of the application is deferred to a later stage and considered separately, which is precisely what happened here.

. . . All applications will be reviewed on the basis of the
following elements, which are listed in descending order of
priority, except that [elements (iv) and (v)] are of equal
importance.

(i) Services offered.  The extent and range of proposed
services, such as meals, shelter, job training, and
counseling.

(ii) Need.  The demand for the program and the degree to
which the available property will be fully utilized.

(iii) Implementation Time.  The amount of time necessary for
the proposed program to become operational.

(iv) Experience.  Demonstrated prior success in operating
similar programs and recommendations attesting to that fact
by Federal, State, and local authorities.

(v) Financial Ability.  The adequacy of funding that will likely
be available to run the program fully and properly and to
operate the facility.

45 C.F.R. § 12a.9(e)(2).  The Coalition argues that HHS acted arbitrarily and

capriciously when it denied the Coalition's application on a criterion (financial ability)

that is "considered to be of lowest priority."  (ECF No. 9 at 28.)

This regulation, however, is now highly questionable given the FAST Act's new

requirement that financial ability be considered separately, rather than weighed together

with other factors.  The Coalition has not shown likelihood of success in establishing

that this regulation still controls, as written.[8]

---

[8] For the first time in its reply brief, the Coalition argues that the FAST Act was intended
to *ease* homeless assistance groups' burden to establish financial ability.  (ECF No. 20 at 10.)
The Coalition goes so far as to attach a declaration from the executive director of a homeless
advocacy group that the Coalition represents to be "the primary advocate[] for the changes in
the FAST Act amendments."  (*Id.*)  According to this declaration, the advocacy group intended
to "lower[] the standard by which HHS evaluates proof of adequate financing."  (ECF No. 20-3
¶ 8.)  Setting aside the fact that this argument was raised for the first time in the Coalition's reply
brief and relies on a highly contestable form of legislative history (an advocacy group's
intentions), the Court would reach the same conclusion as it does in this Order even accepting
that "a reasonable plan to finance the approved program" is meant to be comparatively

2. <u>Procedures HHS Did Not Employ</u>

   a. *Arguments 4 & 9*

The Coalition's arguments 4 and 9 are variations on the same theme: if HHS saw problems or weaknesses in the Coalition's application, it should have reached out to the Coalition and provided the Coalition an opportunity to supplement or clarify before reaching a final determination. (ECF No. 9 at 18–20, 26–27.) Argument 4 specifically addresses the Coalition's admitted mistake when it attached the partially executed Purchase and Sale Agreement for the Renaissance 88 Apartments. (*Id.* at 18–19.) The Coalition does *not* argue that HHS should have accepted the partially executed agreement as sufficient proof that the Coalition would net about $6.6 million from the sale, of which $5 million would go to the Property construction budget. Rather, the Coalition asserts, "That HHS would conclude that [the Coalition] was purposely relying on an unexecuted and invalid agreement to document available funds is unimaginable and specious, and the failure of HHS to request clarification from [the Coalition] was arbitrary and capricious." (*Id.*) Argument 9 expands on Argument 4, claiming that HHS had a general obligation to allow the Coalition "the opportunity to provide additional clarification or additional materials HHS felt was needed." (*Id.* at 26.) For all practical purposes, however, the Court has no power to overturn HHS's decision on this basis.

The closest applicable HHS regulation states, "Upon receipt of an application, HHS will review it for completeness, and, if incomplete, may return it or ask the applicant to furnish any missing or additional required information prior to final

---

lenient. The FAST Act still mandates a separate consideration of financial ability, and the Coalition has not met its burden to show it will likely succeed in proving that HHS acted arbitrarily and capriciously when it concluded that the Coalition's plan did not rise to the level of "reasonable." (*See* Part IV.D, below.)

evaluation of the application." 45 C.F.R. § 12a.9(e)(1). As thoroughly explained by the United States District Court for the District of the District of Columbia, the plain terms of this regulation embrace two stages: (1) a review for completeness, *followed by* (2) a final evaluation. *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 118 (D.D.C. 2010). "[W]here the application is complete, the regulations are silent as to the furnishing of additional information." *Id.* The Coalition does not argue that HHS arbitrarily and capriciously concluded that the application was complete and therefore ready for final evaluation. Thus, by its terms, this regulation does not apply.

To the extent the Coalition argues that HHS should have reached out anyway, the Court agrees from a perspective of simple civility, and is dismayed by HHS's refusal to do so. But the Court is extremely constrained in its ability to overturn agency action on this basis:

> Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute [governing the agency's action]. But such circumstances, if they exist, are extremely rare.

> \* \* \*

> Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524, 543 (1978) (internal quotation marks omitted); *see also New Life*, 753 F. Supp. 2d at 120 ("courts are not free to impose upon agencies specific procedural requirements

that have no basis in the APA or the governing legislation" (internal quotation marks omitted)).

The Coalition points to no constitutional principle, nothing in the McKinney Act or the APA, and no extremely compelling circumstances that would *require* HHS to reach out for clarification or provide an opportunity to supplement an inadequate application— particularly when HHS is under a statutory 15-day deadline to make a final determination. *See* 42 U.S.C. § 11411(e)(5). Indeed, HHS's regulations explicitly warn: "Due to the short time frame imposed for evaluating applications, HHS'[s] evaluation will, generally, be limited to the information contained in the application." 45 C.F.R. § 12a.9(c). The Coalition therefore has not shown a likelihood of success in prevailing on its Arguments 4 and/or 9.[9]

### b. *Argument 11*

Argument 11 is closely related to the foregoing, but instead of arguing that HHS should have provided an opportunity to supplement *before* making its final determination, the Coalition argues that HHS should have accepted the Coalition's request to *reconsider* its final determination. (ECF No. 9 at 29.) This argument fails for the same reasons. Nothing in the statute or the regulations requires reconsideration. Thus, absent extremely compelling circumstances that are not evident on this record, the Court cannot hold that HHS acted arbitrarily and capriciously when it refused to

---

[9] As to the Coalition's specific contention under Argument 4 that it was "unimaginable" that HHS would think that the Coalition would rely on an unexecuted Purchase and Sale Agreement (ECF No. 9 at 18–19), the Court frankly disagrees. The Coalition elsewhere relied on potential transactions with no definite counterparty (particularly as to the solar farm), so it was not beyond reason for HHS to infer that the partially executed Purchase and Sale Agreement was more of the same.

undetake a reconsideration procedure.[10]

3. GSA's Actions

a. *Argument 12*

In Argument 12, the Coalition claims that GSA "inappropriately inserted itself into the . . . application review process by raising additional questions and issues that were on their face adversarial to [the Coalition's] application." (ECF No. 9 at 30.) The Coalition further asserts that the McKinney Act and implementing regulations "provide no role for GSA in the review of such application[s]," and so GSA's participation was "an apparent attempt to thwart the Congressional intent of Title V of the McKinney Act and federal regulation[s]." (*Id.*)

This argument is immaterial for a number of reasons. First, there is nothing in the relevant statutes or regulations prohibiting HHS from soliciting any person's or entity's input, so HHS violated no standard when it sought GSA's input. Second, GSA reviewed and commented on the Coalition's *initial* application, which had already been approved. Third, GSA's criticisms are not mentioned as reasons for HHS's final denial. Fourth, the Coalition does not argue that GSA raised illegitimate criticisms of the Coalition's plans. Finally, to the extent the Coalition means to say that (a) GSA meant to influence HHS's ultimate decision and (b) actually did influence that decision (*i.e.*, prompted HHS to manufacture a reason to deny the application), the Coalition's

---

[10] In a single sentence supported by no authority, the Coalition further argues that "HHS's failure to provide an appeal process or reconsideration of its denial is a violation of Plaintiff's procedural due process in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution." (ECF No. 9 at 30.) Inadequately developed arguments in an opening brief, like this one, are forfeited. *See, e.g.*, *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013); *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008); *Rojem v. Gibson*, 245 F.3d 1130, 1141 n.8 (10th Cir. 2001).

argument falls well short.  In particular, the Coalition does not address this Court's authority under the APA, if any, to inquire into an agency decisionmaker's subjective state of mind.  Nor does the Coalition address how a subjectively inappropriate state of mind on the part of an agency decisionmaker affects the soundness of the decision, particularly if the decision was objectively justifiable for the reasons actually given.  Having failed to address these crucial questions, the Coalition fails to show a likelihood of success on Argument 12.

        b.    *Argument 13*

The Coalition's Argument 13 claims that GSA acted arbitrarily and capriciously when it commenced auction proceedings for the Property.  (ECF No. 9 at 31.)  The Coalition points to 45 C.F.R. § 12a.12(b): "Upon advice from HHS that all applications have been disapproved, or if no completed applications or requests for extensions have been received by HHS within 90 days from the date of the last expression of interest, disposal may proceed in accordance with applicable law."  The Coalition claims this regulation was violated because "GSA was aware of [the Coalition's pending] request for reconsideration [submitted March 27, 2018]" when it commenced the auction on April 2, 2018.  (ECF No. 9 at 31.)

This argument misses the mark for several reasons.  First, the factual predicate—GSA's knowledge of the reconsideration letter sent to HHS—is not established in the record.  Second, no reconsideration procedure exists, nor is any required, so it is not clear how GSA's actions despite knowledge (if any) of a reconsideration request can be deemed arbitrary and capricious.  Third, the cited regulation plainly authorizes "disposal" to "proceed in accordance with applicable law"

23

when the landowning agency (here, GSA) receives "advice from HHS that all applications have been disapproved."  45 C.F.R. § 12a.12(b).  GSA acted according to this regulation, not contrary to it.  The Coalition's Argument 13 therefore fails to demonstrate a likelihood of success on the merits.

    4.    <u>Injunction in the District of the District of Columbia</u>

Part of the Coalition's Argument 6, and all of its Argument 14, relies on a decades-old McKinney Act lawsuit in the United States District Court for the District of the District of Columbia.  (ECF No. 9 at 22–23, 31–32.)  The lawsuit is captioned *National Law Center on Homelessness and Poverty et al. v. United States Veterans Administration et al.*, Case No. 88-cv-2503 ("*NLCHP*").  The lawsuit has been through several phases and has been reopened on many occasions.  *See New Life*, 753 F. Supp. 2d at 126–29 (summarizing the *NLCHP* proceedings).  As relevant here, the district court (in 1991) enjoined HHS as follows: "HHS must allow an intent to apply for Title IV funds to be sufficient to satisfy the homeless provider's financial showing requirement."  *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 765 F. Supp. 1, 13 (D.D.C. 1991), aff'd, 964 F.2d 1210 (D.C. Cir. 1992).  This refers to Title IV of the McKinney Act, which establishes a federal grant program to support homeless assistance projects.  *See* 42 U.S.C. §§ 11360–11408a.

The Coalition's application does not announce an intent to apply for Title IV funding.  Furthermore, the Coalition recognizes that the above-quoted injunction language was stricken last year on a joint motion of the parties to the *NLCHP* lawsuit, in light of the FAST Act's requirement for a reasonable financial plan.  (ECF No. 9 at 22–23; *see also* ECF No. 19 at 22–23 (providing further detail).)  The Coalition argues,

however, that (i) the since-stricken injunction language was "merely a procedural change" and the underlying substance "continues to apply to HHS"; and (ii) "the requirement of allowing 'an intent to apply' for funding is not limited to Title IV funds, but generally applies to an intention to apply for other funding and financing sources such as those identified in [the Coalition's] application."  (ECF No. 9 at 23.)

The problems with this argument are systemic.  First, the only authority the Coalition cites for its interpretation of the recent change to the injunction is the personal views of the NLCHP's lawyer.[11]  Second, the Coalition is essentially asking this Court (a) to interpret another court's injunction; (b) even more tenuously, to interpret that court's intentions when modifying its injunction; and then (c) to enforce the injunction. The Coalition cites no authority giving this Court power to undertake any of those actions.  Third, the Coalition argues that the (since-stricken) reference to Title IV funding was never really meant as a reference only to Title IV funding.  Again, the Coalition cites no authority for this proposition, which otherwise runs counter to the notion that injunctions are interpreted strictly.  *See, e.g.*, *Reliance Ins. Co. v. Mast Const. Co.*, 84 F.3d 372, 377 (10th Cir. 1996) (in contempt proceedings, "[a]ny ambiguities or omissions in the order will be construed in favor of [the person charged with violating the order]").

To the extent the Coalition invokes the *NLCHP* injunction simply as support for the broader notion that HHS has previously been admonished for interpreting the McKinney Act too strictly (*see* ECF No. 9 at 31–32), the Coalition does not explain how

_____

[11] In its opening brief, the Coalition simply announces that Parvensky "has discussed this change with the [NLCHP's] counsel."  (ECF No. 9 at 23.)  The Coalition attaches a declaration from NLCHP's counsel to its reply brief.  (ECF No. 20-3.)

that accusation should factor into the Court's current task of evaluating HHS's decision regarding the Coalition's application for the Property. For example, if a prior lawsuit finds that an agency acted arbitrarily and capriciously, may the court in a later, similar lawsuit apply less deference to the same agency? The Coalition does not attempt to address this matter, and therefore fails to show a likelihood of success.

## C. Substantive Challenges

The Court now turns to the Coalition's substantive arguments (nos. 3, 5, 7, 8, and the remainder of 2 and 6).

### 1. Overall Evaluation

Argument 2 accuses HHS of "play[ing] a game of 'gotcha', basing its denial on a series of conclusions that were minor, immaterial, arbitrary and capricious." (ECF No. 9 at 16.) This argument is really a conclusion, not an argument. If one agrees with the Coalition that HHS's reasons for denial were individually "minor" or "immaterial," then perhaps one can deem HHS's entire approach as arbitrary and capricious. Thus, the Court must examine the specific reasons for denial.

### 2. Fire Alarms & Water Costs

HHS's denial letter faulted the Coalition for failure to itemize the cost of a fire alarm system (as part of construction expenses), or the cost of water (as part of operating expenses). (ECF No. 9-14 at 1.) The Coalition's Argument 3 asserts,

> It would be impossible for an applicant to anticipate and identify every possible cost in the development or operation of a complex program such as that proposed by [the Coalition]. Under HHS's rationale, it could identify any conceivable cost that an applicant did not specifically detail, and determine that the failure to identify it, no matter how inconsequential the cost, would be a basis for denial of the application and evidence of the failure to provide a reasonable financing plan.

(ECF No. 9 at 18.)

The Court agrees that failure to itemize the cost of a fire alarm system is a petty objection under the circumstances. The failure to account for water is somewhat more serious, and it is not clear how HHS was supposed to divine that the line item "labeled as Trash should have been labeled as Trash and Utilities, including water." (ECF No. 9-15 at 2.) But the likely cost of water compared to overall operating costs is something HHS should have understood to be fairly minimal. Thus, if HHS had limited its reasons for denial to either or both of the failure to itemize fire alarm or water costs, the Coalition would have a relatively strong argument.

The APA requires this Court to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. The Court will assume that HHS's reasoning with regard to fire alarm and water costs was arbitrary and capricious. The question, then, is whether the Coalition has been prejudiced by this error. *See Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012) ("even if an agency violates the APA, its error does not require reversal unless a plaintiff demonstrates prejudice resulting from the error"); *Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989) ("if an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable"). The Court cannot answer that question without first examining the remainder of HHS's reasons for denying the application.

3.  Renaissance 88 Sale Proceeds

a.  *Argument 5*

HHS also denied the application because the Coalition had not shown that the

$5 million expected to be available from the Renaissance 88 Apartments sale was more than speculative. Argument 5 attacks this conclusion. (ECF No. 9 at 19–20.)[12]

The Coalition contends that its final application included a March 1, 2018 commitment letter, on Coalition letterhead and signed by Parvensky, through which the Coalition committed $5 million from the expected $6.6 million sale. (*See id.*; ECF No. 9-19.) The Coalition asserts that "the documented commitment itself from [the Coalition] of $5 million . . . satisfies the FAST A[ct] requirement of a 'reasonable plan' supporting the availability of funding." (ECF No. 9 at 20.)[13]

The Court sees merit in the broader principle implied by Argument 5. For example, if an applicant has a commitment letter from a reputable bank, it may be arbitrary and capricious for HHS to deny an application on grounds that the applicant has not demonstrated the bank's solvency. On the other hand, if HHS has a legitimate reason to question the bank's solvency, then it may not be arbitrary and capricious for HHS to conclude that funds supposedly committed from that bank are actually speculative.

This case is more like the latter example than the former. The Coalition has not established that HHS had a duty to take the Coalition at its word when it promised $5 million from the forthcoming sale, given that HHS had reason to believe that the sale

---

[12] Argument 5 somewhat overlaps with the contention in Argument 4, discussed above (Part IV.B.2.a), that HHS should have reached out to the Coalition for clarification. To the extent of that overlap, Argument 5 fails for the same reasons as Argument 4.

[13] The Court could not locate this March 1, 2018 letter within the documents represented to be the exhibits to the Coalition's final application. (*See* ECF Nos. 9-9, 9-10, 9-11.) But Defendants do not object on this basis, *i.e.*, they do not claim that HHS never saw this letter before making its final determination. The Court will therefore assume that the application materials included the letter.

itself was speculative.  The Court therefore finds no likelihood of success of demonstrating arbitrary and capricious conduct under Argument 5.

   b. *The San Francisco Comparison*

  Related to Argument 5 (and also Argument 4), the Coalition argues—for the first time in its reply brief—that its application was similar to San Francisco's approved application mentioned in the Coalition's letter requesting reconsideration, and so the Coalition's application likewise should have been approved.  (*See* Part III.F.1, above.) According to the Coalition, San Francisco's application was approved after it showed commitments for $50.4 million on a project with an overall budget of $127 million, with the remainder of the funding to be applied for.[14]  Thus, HHS required San Francisco only to demonstrate commitments for about 40% of the needed funding.  The Coalition seems to be saying that its application should likewise have been approved, even if the application showed a significant funding shortfall.  (ECF No. 20 at 6–7.)

  Perhaps anticipating an argument such as this, Defendants note in their response brief what HHS pointed out in its letter denying reconsideration, namely, that HHS evaluated the San Francisco application through the one-step pre-FAST Act procedure.  (ECF No. 19 at 27 n.10; *see also* Part III.F.2, above.)  And in reply, the Coalition asserts that it never knew that its application was supposedly being evaluated differently than San Francisco's, save for the two-step process mandated by the FAST Act.  (ECF No. 20 at 7.)  This, says the Coalition, "was prejudicial, adverse to [the Coalition], manifestly unfair, and therefore arbitrary and capricious."  (*Id.*)

  The Court will not relitigate the San Francisco application here.  That application

---

[14] The document establishing the overall budget of $127 million is attached to the reply brief only.  (*See* ECF No. 20-1.)

is not before the Court, save for brief excerpts.  Even if HHS approved the San

Francisco application with only 40% of the funding committed, it was not necessarily

arbitrary and capricious to find that a $5 million shortfall (at a minimum) out of a

$12 million budget showed a lack of a reasonable plan to finance the Coalition's

proposed use of the Property.  The Court presumes that HHS reviewed each of the

applications on their respective merits and according to the individual circumstances

each presented.  The Coalition has not demonstrated that the similarities between San

Francisco's application and the Coalition's application are so compelling and pervasive

that approval of the former but denial of the latter can only be explained by arbitrary or

capricious decisionmaking.  Pointing to the San Francisco application does not,

therefore, bolster the Coalition's likelihood of success.

        4.    <u>The Solar Farm</u>

        HHS also saw a funding shortfall as to the solar farm because the Coalition

pointed only to "interest" from equity investors and general optimism concerning a

lender.  (ECF No. 9-14 at 2.)  The Coalition's Argument 6 asserts that its submissions

regarding the solar farm should have been enough because the application instructions

allow applicants to state their "proposed sources of funding to carry out the proposed

program and development," including "the estimated amount of funds each source will

provide."  (ECF No. 9 at 22 (quoting ECF No. 9-22 at 12).)

        The application instructions merely show that HHS will consider potential funding

that is less than committed.  The instructions do not bind HHS to conclude that a

reasonable financing plan exists simply because the applicant can "propose" sources of

funding that are not yet available.  Importantly, the same page of the application

instructions also asks for details on "any past grants, uses of past grants, prior fund-raising activities, commitment letters, details of awards, etc." (ECF No. 9-22 at 12.)

The Coalition attaches to its reply brief a May 24, 2018 letter to the Coalition from REV, the consultant that advised it regarding the solar farm. (ECF No. 20-2.) According to this letter, which the Coalition plainly solicited for litigation purposes, it is common business practice for solar investors to avoid "firm commitment" until there is "a reasonable expectation that the project will move forward, demonstrated by control of the land." (*Id.* at 1.) The Coalition also attaches a March 23, 2018 letter from one of the potentially interested equity investors, WGL Energy, stating that it was "standard business practice for renewable energy projects" to wait until "control of the land" is established. (*Id.* at 3.) And finally, the Coalition attaches an April 9, 2018 letter from Colorado Business Bank to REV showing that bank's "expression of interest" subject to "more information." (*Id.* at 4.)

None of these documents were before HHS when it made its final determination. Indeed, it is not clear that HHS saw any of these documents before the Coalition attached them to its reply brief. Accordingly, HHS's decision cannot be deemed arbitrary and capricious based on information HHS never had before it when it made its decision. *Cf. United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

For all of these reasons, the Court sees no likelihood of success in establishing

arbitrary and capricious conduct when HHS concluded that the Coalition did not have a reasonable plan to finance the solar farm.[15]

5. <u>Net Revenue & Operating Expenses</u>

HHS saw a deficiency in the ability to finance ongoing operations because the Coalition elected not to commit a specific portion of its net revenue to the Property. (ECF No. 9-14 at 2.)  Under Argument 7, the Coalition highlights its three-year combined net revenues of more than $25 million and, in that light, asserts that HHS should not have been concerned with the Coalition's ability to operate a project costing $2.7 million per year.  (ECF No. 9 at 23–24.)

Defendants do not vigorously defend this portion of HHS's reasoning, but instead spend more time on the notion of whether prejudicial error occurred in light of the large shortfall in the construction budget.  (*See* ECF No. 19 at 24, 25–26.)  Accordingly, the Court will assume for present purposes that HHS erroneously reasoned that the Coalition had presented insufficient evidence of its ability to cover operating expenses. The Court reserves the prejudicial error analysis for below.

6. <u>The $25 Million Capital Campaign</u>

Lastly, HHS found that the Coalition's generalized intent to raise $25 million for Phases One and Two was too speculative.  (ECF No. 9-14 at 2.)  The Coalition's Argument 8 asserts that its initial application described its fundraising successes

---

[15] A footnote in the Coalition's reply brief deems it "curious" that HHS would "put so much focus on financing for . . . the community solar farm, which is not the critical element of [the Coalition's] plan for using the property."  (ECF No. 20 at 8 n.2.)  The Coalition appears to be saying (although it does not actually say) that HHS should have understood that the Coalition's application was intended to be severable as between the human-habitable structures and the solar farm.  If the Coalition intends such an argument, it has forfeited it for purposes of these preliminary injunction proceedings, having raised it—and, at best, only indirectly—for the first time in the reply brief.

(showing a total of about $1 billion raised over the last thirty years or so), and that should have been enough to satisfy HHS.  (ECF No. 9 at 24–25.)  But the Coalition does not dispute that it failed to direct HHS back to its initial application, nor does the Coalition provide any authority for the idea that the financial portion of the application must be reviewed together with the already-approved initial application.  Indeed, had it prepared this (as well as other) portions of its application package more carefully, it should have been clear to the Coalition—from the perspective of grant proposal writing best practices if nothing else—that the best, most conservative approach here would have been to assume that HHS would *not* refer back to any information not contained within the four corners of the application package, and as a consequence in an abundance of caution referenced its fundraising prowess in the instant application.

Even so, the Court will give the Coalition the benefit of the doubt that it will likely succeed in proving that this portion of HHS's reasoning was arbitrary and capricious. The Court must now address prejudicial error.

## D.    Prejudicial Error

At most, the Coalition has shown a likelihood of success in establishing that HHS acted arbitrarily and capriciously in faulting the Coalition for: failure to itemize fire alarm and water expenses; failure to commit yearly net revenue to operating expenses; and failure to refer back to information in the initial application regarding the Coalition's fundraising record.  The Court finds that these instances of erroneous reasoning, if they were erroneous, were not prejudicial.  As far as HHS had been informed, $8.7 million ($5 million for housing + $3.7 million for the solar farm) out of the $12.6 million construction budget was speculative.  On the record presented, the Court is confident

that HHS "would clearly have acted on that ground even if [its other reasons were erroneous]." *Syracuse Peace Council*, 867 F.2d at 657. Thus, HHS's errors, if any, were harmless.

### E. Arguments Grounded in Statutory Purpose

Finally, the Court addresses the Coalition's more generalized arguments based on the policy of the McKinney Act. A theme running throughout the Coalition's briefing is that the McKinney Act favors disposition of surplus property for homeless assistance, and so HHS should have helped the Coalition to submit a successful application. (*See, e.g.*, ECF No. 9 at 19, 25, 30.)

But the McKinney Act embodies at least two policies. One is the most obvious: to assist the homeless. The other is to ensure that decisions about disposal of surplus federal property will not take too long—hence the relatively short deadlines and lack of a statutorily mandated appeals process. There is every reason to question whether Congress has tipped the scales too much toward expediency, as compared to addressing and helping to ameliorate the persistence and tragedy of homelessness. And from a strictly public policy perspective, the undersigned agrees with the Coalition that to the extent that has indeed taken place, such a change in priorities can work a cruel and cynical retreat from the original spirit and purpose of the McKinney Act.

But, once again, there is no reason to question whether this is the regime Congress has actually and, unfortunately for the Coalition, most recently established. The Coalition points to nothing in the McKinney Act or its regulations supporting its view that it is HHS's responsibility to give an applicant extra chances or the benefit of the doubt. HHS's task, rather, is to evaluate the materials actually submitted under the

standards *and* within the timeframe(s) that Congress established. Given the limits to the Court's remedial powers in these final agency decision review actions imposed by the highly deferential § 705 standard of review, this deficiency in the Coalition's argument is effectively dispositive of its current motion.

Thus, on the arguments presented, the Court finds that the Coalition's generalized arguments, about how HHS should have approached the Coalition's application in light of the McKinney Act's purposes and policies, are a legally insufficient basis upon which to grant the Coalition the relief it seeks.

## V. CONCLUSION

For the reasons set forth above, the preliminary injunction portion of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 9), construed as a motion for stay of agency action under 5 U.S.C. § 705, is DENIED.

Dated this 25th day of June, 2018.

BY THE COURT:

William J. Martinez
United States District Judge