# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 18-cv-1008-WJM-KLM

THE COLORADO COALITION FOR THE HOMELESS, a Colorado Nonprofit
Corporation,

      Plaintiff,

v.

GENERAL SERVICES ADMINISTRATION, and
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

      Defendants.

---

## ORDER AFFIRMING AGENCY DECISION

---

Plaintiff The Colorado Coalition for the Homeless ("Coalition") seeks review
under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, of a decision
by Defendant United States Department of Health and Human Services ("HHS")
denying the Coalition's application to assume control of a surplus piece of federal
property and convert it into a location providing shelter and other services to the
homeless.  The Coalition has also sued the General Services Administration ("GSA"),
which has some oversight authority over the surplus property.  However, GSA is only a
marginal actor here and the Coalition currently asserts no arguments that GSA acted
unlawfully.  Accordingly, the Court will usually refer only to HHS below, rather than to a
group designation such as "the Government" or "Defendants."

For the reasons explained below, the Court finds that HHS did not act arbitrarily,
capriciously, or contrary to law when it denied the Coalition's application.  The Court

therefore affirms HHS's decision.

## I. LEGAL STANDARD

The APA empowers a reviewing court to set aside agency action if it is, *inter alia*,

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).  Generally, an agency decision will be considered arbitrary and

capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A

reviewing court should engage in a "thorough, probing, in-depth review," *Wyoming v.*

*United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation omitted), with its review of

the merits "generally limited to . . . the administrative record," *Custer Cnty. Action*

*Assoc. v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001).

However, "[t]he scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency."  *Motor*

*Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Davis v. Mineta*, 302 F.3d 1104, 1111

(10th Cir. 2002) (stating that the court's review is "highly deferential"), *abrogated on*

*other grounds by Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276

(10th Cir. 2016).  The Court confines its review "to ascertaining whether the agency

examined the relevant data and articulated a satisfactory explanation for its decision,

including a rational connection between the facts found and the decision made."  *Colo.*

*Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

## II.  STATUTORY BACKGROUND

In 1987, Congress enacted the Stewart B. McKinney Homeless Assistance Act, Pub. L. No. 100-77, 101 Stat. 482 (codified at 42 U.S.C. §§ 11301 *et seq.*) ("McKinney Act" or "Act").[1]  Title V of the Act (42 U.S.C. §§ 11411–12) requires federal agencies to consider regularly whether "excess," "surplus," "unutilized," or "underutilized" federal properties are "suitable for use to assist the homeless."  42 U.S.C. § 11411(a).  As amended, the Act assigns to the Department of Housing and Urban Development ("HUD") the responsibility to publish on its website a list of all excess, surplus, unutilized, and underutilized properties, and a list identifying which of those have been designated as suitable for homeless assistance.  *Id.* § 11411(c)(1)(A).

Upon such publication, a homeless assistance organization has thirty days to file a "written notice of intent to apply for such a property for use to assist the homeless." *Id.* § 11411(d)(1)–(2).  Or, if a homeless assistance organization disputes a government agency's finding that a particular property is *not* suitable, the organization may file "for review of [the unsuitability] determination" within twenty days.  *Id.* § 11411(d)(3).

As to properties deemed suitable, the application process (after submitting a notice of intent) has recently changed.  Until late 2016, the McKinney Act stated that a party seeking to take over federal property was required to "submit a complete application" to HHS within ninety days "after submission of written notice of intent to

---

[1] Some court decisions, statutory sections, and legislative history give the long name of this enactment as the "McKinney-Vento Homeless Assistance Act," often shortened to the "McKinney-Vento Act."  The Court has thus far been unable to locate any Congressional pronouncement officially changing the name of the entire act.  Congress christened a 2001 amendment to the McKinney Act as the "McKinney-Vento Homeless Education Assistance Improvements Act of 2001," *see* Pub. L. No. 107-110, tit. X, §§ 1031–32, 115 Stat. 1989, but that refers specifically to the portions codified at 42 U.S.C. §§ 11431–35.

apply for a property." 42 U.S.C. § 11411(e)(2) (2012).  HHS then had "25 days after receipt of a completed application" to decide whether to approve the application.  *Id.* § 11411(e)(3).

In December 2016, Congress enacted the Federal Assets Sale and Transfer Act ("FAST Act"), Pub. L. No. 114-287, 130 Stat. 1463.  Among other things, the FAST Act amended the McKinney Act to create a two-step application procedure.  *See id.* § 22(4). Homeless assistance providers must now file an "initial application" within seventy-five days of the notice of intent.  42 U.S.C. § 11411(e)(2)(A).  This initial application must focus on "the services that will be offered," "the need for the services," and "the experience of the applicant that demonstrates the ability to provide the services."  *Id.* § 11411(e)(2)(B).  HHS must approve or disapprove the initial application within ten days.  *Id.* § 11411(e)(3).

If HHS approves, the applicant has forty-five days "in which to provide a final application that sets forth a reasonable plan to finance the approved program."  *Id.* § 11411(e)(4).  "No later than 15 days after receipt of the final application," HHS must "make a final determination."  *Id.* § 11411(e)(5).  The McKinney Act contains no provision for an administrative appeal of HHS's final determination.

## III.  FACTUAL & PROCEDURAL BACKGROUND

### A.  The Property

GSA owns and manages a 670-acre site in Lakewood, Colorado, known as the "Denver Federal Center."  *See Colo. Coal. for Homeless v. Gen. Servs. Admin.*, 2018 WL 3109087, at *2 (D. Colo. June 25, 2018) (ECF No. 21) ("§ 705 Order").  "The northwest corner of the Denver Federal Center comprises a vacant 59-acre parcel commonly known as Federal Center Station because it is immediately adjacent to a bus

and light rail station also known as Federal Center Station." *Id.* The Court will refer to the 59-acre parcel simply as "the Property."

## B. The Notice of Intent and the Application Packet

In a notice dated October 6, 2017, HHS announced that the Property had been "determined suitable . . . for homeless use," and invited McKinney Act applications. (Administrative Record (ECF No. 27) ("R.") at 130.)[2] Later that same day, the Coalition's president, Mr. John Parvensky,[3] submitted to HHS a letter of intent to apply for the Property. (R. at 1159.) On October 12, 2017, an HHS representative, Ms. Teresa Ritta, e-mailed Parvensky to acknowledge the Coalition's letter of intent, to provide application forms and instructions, and to establish deadlines. (R. 1157–58.) Also attached to the e-mail was a copy of 45 C.F.R., Part 12a, which governs applications such as the Coalition's. (*Id.* at 1157.)

Ritta informed Parvensky that the Coalition's application would "initially [be] reviewed on the basis of four evaluation criteria: Services Offered, Need, Implementation Time, and Experience." (*Id.*) These four criteria match the first four evaluation criteria (out of five total) listed in the applicable regulation. *See* 45 C.F.R. § 12a.9(e)(2)(i)–(iv). Alluding to the fifth regulatory criterion—"Financial Ability," *id.* § 12a.9(e)(2)(v)—or to the Fast Act (or both), Ritta then stated, "If HHS determines that the applicant [has] met [the first] four evaluation criteria, the applicant is given forty-five (45) days to present a final application containing a reasonable financial plan . . . ."

---

[2] The Administrative Record submitted at ECF No. 27 contains two separate administrative records, one assembled by HHS and one assembled by GSA. As it turns out, the Court need not cite anything from the GSA record. Therefore, all "R." citations in this order are to the HHS record.

[3] Parvensky is also the Coalition's attorney in this lawsuit.

(R. at 1157.)

Ritta therefore directed Parvensky to an attached "application packet which contains instructions for completing an initial application to acquire surplus property. The applicant must complete all items of the application packet, excluding items 4.(B), 4.(C), 4.(D) and 4.(E), which pertain to the applicant's proposed financial plan." (*Id.*) The excluded "items 4.(B), 4.(C), 4.(D) and 4.(E)" of the application packet called for detailed estimated costs to develop and operate the property, as well as information about ability to finance construction and operation. (R. 1174–75.) Ritta then recapitulated that, "[i]f HHS determines the applicant met the initial four review criteria, HHS will notify you by letter. At that time, the applicant will be given 45 days to submit a reasonable financial plan." (R. at 1157.)

The attached application instructions included the following warning:

> Applications determined incomplete will either result in a disapproval of the application or a request for additional information. It is to the applicant's benefit to err on the side of providing too much information as opposed to omitting information or not providing enough detail. It is the applicant's responsibility to ensure their application presents all the information requested in a detailed and complete manner.

(R. at 1169.)

## C.    The Initial Application

On December 21, 2017, Parvensky submitted the Coalition's initial application. (R. at 140–797.) The Coalition's proposed "Phase One" project was "a campus of emergency shelter and transitional housing and services for homeless families and individuals using temporary structures constructed or placed on the site." (R. at 148.)[4]

---

[4] The Coalition also described plans for a later Phase Two involving permanent

On December 29, 2017, HHS sent Parvensky a letter requesting clarification or more specific information concerning numerous aspects of the initial application. (R. at 837.) Parvensky responded on January 12, 2018 (R. at 840), and HHS announced its initial approval in a letter to Parvensky dated January 23, 2018 (R. at 919). HHS therefore set a March 9, 2018 deadline (*i.e.*, forty-five days out) for the Coalition to complete "Application Items 4B, 4C, 4D, and 4E [what the October 2017 letter referred to as 'items 4.(B), 4.(C), 4.(D) and 4.(E)'] related to the ability to finance the development and operation of the approved program of use." (*Id.*) Those application items read as follows:

> (B)    Detail the estimated costs anticipated to prepare the property for full utilization, including:
>
>> (1)    Renovations to existing facilities;
>>
>> (2)    Construction of new facilities; and
>>
>> (3)    Changes to the land areas (e.g. parking, recreational, open space).
>
> * * *
>
> (C)    Detail the estimated costs anticipated to operate the program, including any maintenance costs.
>
> (D)    Give a full and complete statement of the ability to finance, operate, and maintain the property requested. Identify the source of funding for converting the property for its intended use, including any new improvements. Identify funding sources for program operation separately. Be sure to include the capital outlay budget and the following, if applicable:
>
>> (1)    Special building funds;
>>
>> (2)    Undistributed reserve;

---

structures, but the Coalition was not seeking approval of that second phase. (R. at 143–44, 148–49.)

(3) Property tax rate;

(4) Funds available for personnel and maintenance (include any expected volunteer resources, if applicable);

(5) Amount raised by taxation;

(6) State appropriation;

(7) Other (contracts, services, federal payments, fund-raisers, grants, etc.)

**NOTE:** If the funding sources under "Other" are of a general nature, the application should provide details for each source listed under "Other", including any past grants, uses of past grants, prior fund-raising activities, commitment letters, details of awards, etc.

\* \* \*

(E) If the applicant contemplates that major construction/renovation is necessary to make the property suitable for full utilization, and funds are not currently available, give plans and proposed sources of funding to carry out the proposed program and development. Please include the estimated amount of funds each source will provide, including any anticipated grants.

(R. at 1174–75 (formatting in original).)

## D. The "Reasonable Plan to Finance" Portion of the Application

### 1. The Coalition's Financial Plan

On March 9, 2018, the Coalition submitted the portion of its application concerning ability to finance its proposed project. (R. at 932–1141.) It estimated that the cost to develop the Property would be about $12.6 million, comprising approximately $8.9 million for human-habitable structures and related development, and approximately $3.7 million for a solar farm that would sit atop a portion of the Property that is a capped landfill. (R. at 951, 954.)

Concerning the $8.9 million needed for the human-habitable structures, the Coalition claimed it would obtain the funding as follows: $1 million committed from "development fees" earned by a Coalition subsidiary that builds low income housing projects; $3.05 million committed from the Coalition's existing funds; and $5 million committed from a $6.6 million profit that the Coalition expected to earn upon closing the sale of an apartment complex known as the Renaissance 88 Apartments. Those sources, added together, came to a little over $9 million, and so would be more than enough to cover the $8.9 million estimated price tag of the proposed residential and administrative structures, and associated development (*e.g.*, utilities). (R. at 958.)

Concerning the $3.7 million needed for the solar farm, the Coalition announced that it expected to find a "tax credit equity investor" to invest about $1.3 million. (R. at 951.) In other words, the Coalition was seeking an investor willing to contribute equity "in exchange for the solar tax credit benefits . . . and the tax benefits from depreciation." (*Id.*) The Coalition announced that one of its consultants had "discussed this project with a number of potential investors and ha[d] identified strong interest from multiple investors and lenders. These include US Bank, Bank of America, Colorado Business Bank, [and] WGL Energy, a division of Washington Gas and Electric, a multibillion dollar capital source." (R. at 953 (emphasis removed).)

For the remaining $2.4 million needed to build the solar farm, the Coalition described certain programs under which the local utility company and others in the community would buy excess solar power at a specified rate per kilowatt hour. The Coalition opined that the expected revenue from those sources would be enough to secure a bank loan for the needed $2.4 million. (R. at 952.) Given that US Bank had

loaded the Coalition $7 million "over the past five years," the Coalition stated that it was "confident that US Bank, or another investor" would provide a loan. (R. at 953.) Later in the application the Coalition noted that it had not yet obtained a commitment for a bank loan, but the Coalition's consultant assured the Coalition that there was "significant lender interest." (R. at 959.) The Coalition estimated that it could "obtain such commitments within Sixty days of approval by HHS of [the] application." (*Id.*)

The application packet also required the Coalition to describe its plan for operating expenses on the Property. The Coalition estimated yearly operating expenses of about $2.7 million. (R. at 957.) The Coalition also stated that its net revenue for 2015 was a little over $5 million; for 2016, about $16.7 million; and for 2017, just under $3.7 million. (R. at 960.) Based on this three-year track record, the Coalition proposed that sustaining annual operational costs of $2.7 million would not pose a problem. (*Id.*) Thus, the Coalition "believe[d] that the ongoing cost of the Phase One operations can be absorbed by existing [Coalition] revenue sources without specific designation." (*Id.*) The Coalition also "project[ed] raising more than $25 million to support the initial Phase One and Phase Two components of the project," but provided no details to explain that projection. (*Id.*)

2.  HHS's Denial

By letter dated March 23, 2018, HHS announced its denial of the Coalition's application

> because [the Coalition] failed to meet threshold requirements
> related to [its] ability to finance the development and
> operation of the approved program of use. More specifically,
> as detailed below, many aspects of the submitted financial
> plan are either incomplete or speculative and therefore fail to
> meet the requirements of 42 U.S.C. 11411(e)(4) and 45
> C.F.R. 12a.9(b)(4).

(R. at 1148.)

The first specific reason for denial was that the Coalition's estimated costs failed to include installation of a fire alarm system, and yearly operating costs for water. (*Id.*)

The second specific reason for denial related to the $5 million pledged from the expected $6.6 million profit on the Renaissance 88 Apartments sale. HHS noted that the document the Coalition attached to support this claim was a Purchase and Sale Agreement executed only by the seller, not by any buyer. (*Id.*) Moreover, HHS noted that the Coalition "'expects' . . . net receipts of $6,658,684," but the Coalition "did not provide documentation . . . indicating how much debt exists, how much will remain after debts are paid, and how net receipts would be distributed." (*Id.*)

The third specific reason for denial related to the solar farm. As to the tax credit equity investor, HHS noted that the Coalition "failed to provide documentation demonstrating commitment, or even interest, on the part of a specific lender [*sic*], related to investing in this type of project." (R. at 1149.) And, as to the bank loan, the Coalition again "failed to provide documentation demonstrating commitment, or even interest, on the part of a specific lender, related to providing financing for this type of project." (*Id.*) HHS also faulted the Coalition for failing to provide documentation showing that it qualified for the utility company programs that would purchase excess solar power at a specified rate. (*Id.*)

The fourth specific reason for denial related to financing ongoing operations: "It isn't clear why [the Coalition] would decline to designate specific funds in order to demonstrate its ability to fund proposed operations. . . . [T]he existence of net revenue, in and of itself, is not indicative of [the Coalition's] ability to fund operations without

specific designation." (*Id.*)  And concerning the intent to raise $25 million, the Coalition "did not provide any information demonstrating past success with similar capital campaigns." (*Id.*)

### E. Reconsideration[5]

#### 1. The Request

On March 27, 2018, the Coalition sent a letter to HHS requesting reconsideration.  (ECF No. 9-15.)  As to fire alarm expenses, the Coalition stated that HHS's application materials nowhere mentioned that a fire alarm system might be required, but the Coalition's contingency budget could cover the cost.  (*Id.* at 2.)  As for water expenses, "HHS is correct that we did not separately identify water service costs, this was inadvertent . . . . The $57,000 [line item] labeled as Trash should have been labeled as Trash and Utilities, including water." (*Id.*)

As to the partially executed Purchase and Sale Agreement for the Renaissance 88 Apartments, the Coalition stated that it "mistakenly attached the wrong PDF file" and it was now attaching "the fully executed purchase agreement." (*Id.* at 2–3.)  Moreover, the Coalition provided an itemized breakdown of how the sale proceeds would be applied (*e.g.*, to existing debt), leading to the expected $6.6 million profit, from which $5 million could be pledged to the construction budget.  (*Id.* at 3.)

Concerning the Coalition's failure to explain how it expected to raise $25 million for ongoing operating costs, the Coalition pointed to four paragraphs from its *initial* application that described its annual budget of "approximately $55 million," its success

---

[5] None of the material cited in this Part III.E was included in the administrative record, but HHS does not object on that account and, in fact, relies on these documents in its response brief on the merits.  (*See* ECF No. 29 at 10.)

in raising "more than $750 million over the past 25 years" for capital projects, and its

success in raising "more than $250 million in operational funding over our 33 year

history." (*Id.* at 6.) The Coalition explained that it "did not feel it necessary or

appropriate to be redundant in repeating this information in the final application." (*Id.*)

The Coalition also invoked a May 31, 2017 application from the City and County

of San Francisco to take over vacant surplus federal property for purposes of assisting

the homeless. (*Id.* at 7.) The Coalition noted that, on June 9, 2017, HHS

> requested additional information and clarification on a
> number of questions answered by the City in its initial
> application, including answers to question 4(c) regarding
> operating costs for the proposed use, 4(d) requesting the
> various sources for capital operating and service costs,
> identification of the sources, if any, have been
> committed/awarded, and providing commitment/award
> letters. The City of San Francisco was able to provide such
> additional documentation, and HHS approved its application.
>
> We believe that the failure to allow [the Coalition] to provide
> additional documentation, while allowing other similar
> applicants to do so, is arbitrary and capricious. . . .

(*Id.* (citations omitted).)

2.  Denial

HHS responded by letter dated April 3, 2018. (ECF No. 9-16.) It stated that

neither the McKinney Act nor relevant regulations provide for any appeal procedure.

(*Id.*) Therefore, HHS's "disapproval determination is final and no further consideration

will be given." (*Id.*) It nonetheless went on to explain:

> Approving a final application when an applicant has provided
> incomplete information, such as a partially executed
> document, or has failed to indicate that it relied on material
> contained in the initial application, for which a separate
> determination has already been made, would require [HHS]
> to make a determination based on assumptions and/or
> information not contained within the final application. Given

> [HHS's] workload and the statutorily imposed [15-day]
> deadline for making such determinations, it is incumbent
> upon applicants to provide clear and complete information in
> the final application that demonstrates a reasonable
> likelihood of success in financing the development and
> operation of the proposed program of use.

(*Id.*)  As to San Francisco's recent application, HHS wrote that it "did not begin implementing procedures under the FAST Act until late February of 2017, subsequent to our providing an application to the City and County of San Francisco.  Accordingly, we requested the completion of its application under the prior procedure."  (ECF No. 9-16 at 1.)

## F.    Current Proceedings

The Coalition filed this lawsuit on April 30, 2018, announcing that GSA had put the Property up for auction as of April 2, 2018.  (ECF No. 1 ¶ 4.)  The Coalition filed a motion for a temporary restraining order and preliminary injunction, which the Court construed as a request for stay of agency action under 5 U.S.C. § 705.  The Court found that a handful of the Coalition's many arguments had potential merit, but, under the doctrine of prejudicial error, HHS's decision would have been the same in any event because, "[a]s far as HHS had been informed, $8.7 million ($5 million for housing + $3.7 million for the solar farm) out of the $12.6 million construction budget was speculative." § 705 Order, 2018 WL 3109087, at *16; *see also id.* at *10 n.9 (application gave many indications that financing plans were speculative).  Thus, the Coalition was not likely to succeed on the merits.

The parties then proceeded to assemble the administrative record and brief the merits of HHS's decision.  (*See* ECF Nos. 27–29, 33.)  This matter is now ripe for a final decision.

# IV.  ANALYSIS

The Coalition presents four arguments why HHS's action should be vacated as arbitrary, capricious, or contrary to law.  The Court will address each in turn.

## A.  Implied Congressional Disapproval of the "Financial Ability" Regulation

The Coalition first argues that a comparison between a McKinney Act-implementing regulation and the changes made by the FAST Act show that HHS evaluated the Coalition's financial plan under an improperly strict standard.  (ECF No. 28 at 8–14.)

The regulation in question reads in relevant part as follows:

> . . . All applications will be reviewed on the basis of the following elements, which are listed in descending order of priority, except that [elements (iv) and (v)] are of equal importance.
>
> (i) Services offered.  The extent and range of proposed services, such as meals, shelter, job training, and counseling.
>
> (ii) Need.  The demand for the program and the degree to which the available property will be fully utilized.
>
> (iii) Implementation Time.  The amount of time necessary for the proposed program to become operational.
>
> (iv) Experience.  Demonstrated prior success in operating similar programs and recommendations attesting to that fact by Federal, State, and local authorities.
>
> (v) Financial Ability.  The adequacy of funding that will likely be available to run the program fully and properly and to operate the facility.

45 C.F.R. § 12a.9(e)(2).  This regulation was promulgated in 1991 and has not since changed.  *See* 56 Fed. Reg. 23789, 23798 (May 24, 1991).  It has therefore straddled the implementation of the FAST Act.

The Coalition claims that the FAST Act "adopted" elements (i), (ii), and (iv) of the regulation and "did <u>not</u> accept" elements (iii) and (v).  (ECF No. 28 at 13 (emphasis in original).)  According to the Coalition:

- element (i) is now codified at 42 U.S.C. § 11411(e)(2)(B)(i) ("An initial application shall set forth * * * the services that will be offered . . . .");

- element (ii) is now codified at 42 U.S.C. § 11411(e)(2)(B)(ii) ("An initial application shall set forth * * * the need for the services . . . ."); and

- element (iv) is now codified at 42 U.S.C. § 11411(e)(2)(B)(iii) ("An initial application shall set forth * * * the experience of the applicant that demonstrates the ability to provide the services."),

whereas element (v), in particular, was in some sense superseded and loosened by 42 U.S.C. § 11411(e)(4)'s requirement of "a reasonable plan to finance the approved program."  (*See* ECF No. 28 at 11–13.)

The Coalition frames this as a "*Chevron* step one" analysis (*see id.* at 8), referring to the doctrine of deference to an administrative agency's interpretations of a statute it is charged with implementing, as set forth in the Supreme Court's seminal decision, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[6]  Under *Chevron*, the first question is "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  But if "Congress has not

---

[6] HHS is primarily responsible for administering the portions of the McKinney Act that govern applications by homeless assistance providers.  *See, e.g.*, 42 U.S.C. § 11411(d)(2), (d)(4)(B), (e).

directly addressed the precise question at issue," the second question is whether the agency's interpretation is "a permissible construction of the statute." *Id.* at 843.

By invoking *Chevron* step one, the Coalition seems to be saying that the regulation (45 C.F.R. § 12a.9(e)(2)(v)) is now contrary to the clear intent of Congress and therefore the HHS's interpretation, as embodied in the regulation, is invalid. The Court questions whether this is properly presented as a *Chevron* question. HHS has never construed the relevant portions of the McKinney Act *as amended by the FAST Act*, so there is no current agency interpretation to which the Court might defer. Indeed, as the Court said in its § 705 Order, the regulation "is now highly questionable given the FAST Act's new requirement that financial ability be considered separately, rather than weighed together with other factors." 2018 WL 3109087, at *9.

In any event, if not a *Chevron* argument, the Coalition may at least argue that HHS acted "not in accordance with law," 5 U.S.C. § 706(2)(A), when it evaluated the Coalition's application under regulatory criteria that Congress supposedly rejected. But whether under the "not in accordance with law" framework or the *Chevron* step one framework, the Court disagrees that HHS committed any error in this respect.

To begin, the record is plain that HHS did *not* follow 45 C.F.R. § 12a.9(e)(2) to the letter, but adapted it to the FAST Act. Through its representative, Ritta, HHS instructed Parvensky first to complete portions of the application packet *not* related to financial considerations, *i.e.*, to "exclud[e] items 4.(B), 4.(C), 4.(D) and 4.(E) [of the application instructions]" from the initial application. (R. at 1157.) HHS then approved the initial application and gave the Coalition forty-five days to submit its financial plan. (R. at 919.) At least to that extent, HHS adhered to the FAST Act process. *See* 42

17

U.S.C. § 11411(e)(2)–(4).  In other words, although HHS provided forms and instructions to the Coalition that were obviously based on the pre-FAST Act regulation, HHS clearly communicated that those forms and instructions were not to be followed precisely as written, but rather in a staged process that deferred the financial portion of the application.  The Coalition acknowledges as much.  (*See* ECF No. 28 at 15 ("In the Application Booklet transmittal email, Ms. Theresa Ritta noted that despite what was stated in the text of the Application Booklet, the applicant's submittal would be reviewed in two steps.").)

As for evaluating the financial plan, the Court sees little legal significance in a comparison between the FAST Act language and the preexisting regulation.  Again, 45 C.F.R. § 12a.9(e)(2)(v) states—and has stated since before the FAST Act—that one criterion for application evaluation is "[t]he adequacy of funding that will likely be available to run the program fully and properly and to operate the facility."  And the FAST Act calls for "a reasonable plan to finance the approved program."  42 U.S.C. § 11411(e)(4).  These two standards do not conflict.

It is also quite a stretch to argue that Congress's failure in the FAST Act to mimic the regulatory language amounts to congressional disapproval of the language, even when the FAST Act appears to have mimicked or paraphrased other portions of the regulation.  Although "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to *adopt* that interpretation when it re-enacts a statute *without change*," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (emphasis added), the Coalition does cite—nor could the Court find—any similar rule that Congress is presumed to have *rejected* some part of a regulation when an amendment appears to

be paraphrasing one part of an existing regulation but not another.

Moreover, implied *adoption* of an existing regulatory interpretation generally requires some indication "that the legislature had its attention directed to the administrative interpretation upon reenactment." *AFL-CIO v. Brock*, 835 F.2d 912, 916 n.6 (D.C. Cir. 1987). *A fortiori*, the much more tenuous concept of implied *rejection* calls for a fairly strong indication that Congress meant to disapprove a regulatory interpretation. The Coalition points to no portion of the FAST Act or its legislative history suggesting that that Congress intended the new statutory language ("a reasonable plan to finance the approved program") to somehow supersede the existing, non-conflicting regulatory language ("[t]he adequacy of funding that will likely be available to run the program fully and properly and to operate the facility")—much less supersede it in a way meant to create significant leniency on the financial portion of the application.[7]

The Coalition instead points to much more generic legislative history. For example, the Coalition quotes remarks made by Rep. Darrell E. Issa, chairman of the House Committee on Oversight and Government Reform, at a committee hearing to discuss several proposals to dispose of surplus government property and thereby save federal tax dollars that might otherwise be spent on maintaining those properties. (*See* ECF No. 28-2.) After the committee discussed several proposals, Rep. Issa stated,

---

[7] If implied rejection has any force, Congress's direction that financial ability be considered separately would seem to be a rejection of the regulation's current statement that financial ability is considered of least importance when being weighed against factors such as services offered, need, and implementation time. *See* 45 C.F.R. § 12a.9(e)(2). In other words, in light of the regulation's weighing criteria, the fact that Congress separated the financial analysis from the other criteria could be viewed as disapproval of giving financial ability lesser weight.

> All of your bills deal in some small way with the homeless.
> Each of them seems to reduce the ultimate benefit to the
> homeless.  Hopefully, each of you, as you are looking at
> your bills and bringing them before the committee, will
> recognize that it is unlikely that any bill will leave this
> committee if there is not an equivalent benefit to homeless in
> each of your bills.

(*Id.* at 29.)

The generic, aspirational sentiments of a single representative are no more than

a fleck of a tea leaf from which to divine Congress's intent.  That fleck dissolves into

imperceptibly when one understands that this hearing took place in July 2011.  (*See id.*

at 1.)  The legislation that became the FAST Act was introduced in February 2016.  *See*

2015 CONG US HR 4465 (Westlaw) (Feb. 4, 2016).  The Coalition's brief omits both of

these data points, and otherwise fails to demonstrate any connection between Rep.

Issa's call for "an equivalent benefit to homeless" and the FAST Act's failure to adopt

HHS's regulation regarding financial requirements for McKinney Act approval.

The Coalition, however, points to the Senate's legislative report on the final

version of the FAST Act.  (*See* ECF No. 28 at 9–10.)  The Coalition particularly notes a

statement in that report that "[t]he National Law Center on Homelessness and Poverty

['NLCHP'] issued a letter supporting this legislation 'because it contains important

provisions that will strengthen Title V of the McKinney-Vento Homeless Assistance

Act.'"  (ECF No. 28-1 at 8 (citing a December 9, 2015 letter directed to the Senate

Committee on Homeland Security and Governmental Affairs).)  Again, this language—

from an advocacy group, not a lawmaker—is generic and has no obvious relevance to

what Congress intended vis-à-vis existing HHS regulations, if anything, when enacting a

requirement for "a reasonable plan to finance the approved program."  42 U.S.C.

§ 11411(e)(4).

Moreover, the quoted NLCHP letter was not attached to the Senate report, the Coalition has not provided that letter, and HHS has thus far been unable to obtain a copy through a request to the Senate committee.  (*See* ECF No. 29 at 21 & n.2.)  But HHS has obtained a February 10, 2016 NLCHP letter from the files of the House of Representatives, announcing NLCHP's support for the FAST Act "because it contains important provisions that will strengthen Title V of the McKinney-Vento Homeless Assistance Act."  (ECF No. 29-1 at 1.)  According to this letter, the salutary features of the FAST Act are the speed of the new application process, the flexibility given to homeless assistance providers in choosing whether to take property by deed or lease, and a clarification that permanent housing alone (without accompanying supportive services) is an eligible use of surplus property for homeless assistance.  (*Id.* at 2.)  The letter says nothing about the new language requiring "a reasonable plan to finance the approved program."

For all these reasons, HHS did not act "not in accordance with law," 5 U.S.C. § 706(2)(A), when it evaluated the financial portion of the Coalition's application.  Or, to the extent this is a *Chevron* step one question, the FAST Act language requiring "a reasonable plan to finance the approved program," 42 U.S.C. § 11411(e)(4), does not "directly sp[eak]" to the standards HHS must apply when evaluating the financial portion of a McKinney Act application, *Chevron*, 467 U.S. at 842.

**B.     Other Effects of the FAST Act**

The Coalition next argues, ostensibly in the alternative, that HHS's pre-FAST Act regulatory requirement concerning financial ability is not a permissible construction of the McKinney Act as amended by the FAST Act, and therefore must be disregarded at *Chevron* step two.  (ECF No. 28 at 14–15.)  *See also Chevron*, 467 U.S. at 843 (if

"Congress has not directly addressed the precise question at issue," the next inquiry is whether the agency's interpretation is "a permissible construction of the statute").

At the outset, the Court notes that this argument, even if successful, only gets the Coalition halfway to its desired destination. Assuming *arguendo* that HHS's interpretation of the McKinney Act is an impermissible implementation of the statutory phrase, "a reasonable plan to finance the approved program," 42 U.S.C. § 11411(e)(4), it does not follow that the statutory phrase was meant to establish a standard lenient enough such that it would have been arbitrary or capricious for HHS to deny the Coalition's application. *See* 5 U.S.C. § 706 ("In [evaluating APA challenges] . . . due account shall be taken of the rule of prejudicial error."). Regardless, the Coalition's *Chevron* step two argument fails (again assuming that *Chevron* analysis is appropriate for a regulation that predates a statutory amendment).

The Coalition's argument turns out to be only a minor variation on its *Chevron* step one argument:

> There was no statement by the agency articulat[ing] a rationale for its choice to disregard the revision to [the McKinney Act] signed into law ten months earlier. Without articulating a rationale HHS arbitrarily and capriciously evaluated [the Coalition's] application based upon a standard rejected by Congress.
>
> . . . [T]here should be no deference for an agency decision based upon regulations which clearly conflict with the language of the statute. . . .
>
> . . . HHS did not review [the Coalition's] application using the reasonable plan criteria required by Congress, but reviewed [the Coalition's] financial plan based on the rejected criteria of "financial ability".
>
> . . . HHS did not consider relevant factors and relied on factors that Congress did not intend for the agency to rely on. . . .

(ECF No. 28 at 15.)  For the reasons already stated, the portion of HHS's preexisting regulations calling for an evaluation of "[t]he adequacy of funding that will likely be available to run the program fully and properly and to operate the facility," 45 C.F.R. § 12a.9(e)(2)(v), does not conflict with the FAST Act.[8]

For the first time in its reply brief, the Coalition asserts (without citation) that it relied on the preexisting regulation when preparing its application, and particularly the regulation's statement that the five factors HHS would consider are listed "in descending order of priority," with financial ability being last.  (ECF No. 33 at 5 (referring to 45 C.F.R. § 12a.9(e)(2)).)  The Coalition asserts that "there was no way for [it] to know that HHS was no longer bound by that part of the regulation."  (*Id.*)

Assuming:

- this is a proper reply-brief argument,

- this sort of subjective reliance (unknown to the agency decisionmaker) can render an agency's decision arbitrary or capricious, and

- HHS could have weighed the financial factor against the other factors despite the FAST Act's mandate that financial ability be considered separately,

the Coalition's argument does not entitle it to any relief because the Coalition's reliance

---

[8] In any event, the Coalition's focus on the regulation is misdirected.  HHS's communications with the Coalition make clear that HHS evaluated the Coalition's application primarily through "items 4.(B), 4.(C), 4.(D) and 4.(E)" of the application packet, which are HHS's sub-regulatory elaborations on what it needs to see, financially speaking, in a proper application.  If there was any argument to be made here, it would be that those "items" (quoted in full at Part III.C) are an impermissible implementation of the FAST Act's reasonableness requirement, or perhaps that their sub-regulatory character entitles them to lesser or no deference.  But the Coalition has not advanced any of these arguments, so the Court will not address them.

was not reasonable. Communications from HHS explicitly stated that the application would proceed in two phases, with all of the material related to financial ability deferred to the second phase. (*See* Parts III.B & III.C, above.) Moreover, the Coalition's argument is essentially that it weighed how much effort to put into the financial portion of the application and chose to put in less effort, figuring that some amount of regulatorily-mandated lenience would forgive any shortcomings. That tactical decision was nothing more than poorly calculated risk-taking, which most certainly did not rise to the level of reasonable reliance.

For all these reasons, the Coalition fails to establish that HHS actions were unlawful under a *Chevron* step two analysis.

## C. Comparison to San Francisco Application

Early in this lawsuit, the Coalition argued that HHS acted arbitrarily and capriciously in not reaching out to the Coalition before making a final decision, *i.e.*, to seek clarification on deficient aspects of the financial application. (*See* ECF No. 9 at 18–20, 26–27.) In the § 705 Order, the Court found that the Coalition was not likely to succeed on that argument due to Supreme Court decisions tightly constraining this Court's ability to impose additional procedural requirements on federal agencies. *See* 2018 WL 3109087, at *9–10.

The Coalition, in its merits brief, does not re-raise the argument that HHS had some sort of statutory or regulatory duty to reach out for clarification before making a final decision. Instead, the Coalition ties this contention to the San Francisco application that HHS evaluated in the first half of 2017 (a little before the Coalition began the application process). As described in Part III.E, above, HHS affirmatively sought San Francisco's clarification about the financial aspects of its plan to take over a

certain property, ultimately leading to HHS's approval.

The Coalition invokes case law supposedly standing for the proposition that "[a]gency action is arbitrary and capricious if it reverses its customary agency practice." (ECF No. 28 at 16.) The Coalition seems to be saying that permitting supplementation is HHS's customary practice, and HHS arbitrarily deviated from that practice in this instance.

This argument fails for several reasons. First, the case law on which the Coalition relies—*N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177 (D.C. Cir. 2004), and *De Leon v. Holder*, 761 F.3d 336 (4th Cir. 2014)—involved an agency's deviation from its published precedent during formal adjudication proceedings. HHS's actions here do not properly compare to a formal adjudication bound by published precedent.

Second, the Coalition itself points out that the McKinney Act denial upheld by the federal district court in *New Life Evangelistic Center, Inc. v. Sebelius*, 753 F. Supp. 2d 103, 117–19 (D.D.C. 2010), was an instance in which HHS *refused* to accept supplemental materials. (ECF No. 28 at 17.) So, as far as the record reveals, this Court is aware of two instances (this case and *New Life Evangelistic Center*) in which HHS did not seek, or refused to accept, supplementation, and one instance (San Francisco) in which HHS solicited and accepted supplemental material. As far as the Court can tell, HHS's customary practice is *not* to seek supplementation or clarification, or at least to refuse supplemental materials when proffered. HHS acted consistent with that practice in this instance, not contrary to it.

Third, and consistent with the foregoing, HHS's regulations explicitly warn: "Due

to the short time frame imposed for evaluating applications, HHS'[s] evaluation will, generally, be limited to the information contained in the application."  45 C.F.R. § 12a.9(c).  These are the same regulations on which the Coalition purportedly relied in framing its application.  (*See* Part IV.B, above.)

Fourth, the Court stated in the § 705 Order that it "will not relitigate the San Francisco application here.  That application is not before the Court, save for brief excerpts."  2018 WL 3109087, at *14.  The same remains true today.  In other words, the Court simply does not have enough substance or context to judge whether HHS's approach to the Coalition's application deviated from its approach to the San Francisco application in some way that would render its denial of the Coalition's application arbitrary and capricious.

Fifth, the McKinney Act, as amended by the FAST Act, requires HHS to make a final decision within fifteen days of receiving the financial portion of the Coalition's application.  *See* 42 U.S.C. § 11411(e)(5) ("No later than 15 days after receipt of the final application, the Secretary of Health and Human Services shall review, make a final determination, and complete all actions on the final application.").  In this light, HHS's explanation that it adjudicated San Francisco's application under the pre-FAST Act procedures, and therefore provided San Francisco an opportunity to supplement, makes sense.  Here, HHS was under a more constrained timeline, with the statutory mandate to complete the process even more quickly than before.[9]

For all these reasons, the Coalition fails to establish that HHS acted arbitrarily

---

[9] As the Court previously explained, "the McKinney Act embodies at least two policies. One is the most obvious: to assist the homeless.  The other is to ensure that decisions about disposal of surplus federal property will not take too long—hence the relatively short deadlines and lack of a statutorily mandated appeals process."  2018 WL 3109087, at *16.

and capriciously when it did not afford the Coalition the same treatment as San Francisco.

**D.    Procedural Due Process**

Finally, the Coalition claims that once HHS approves the initial application for surplus federal property, the McKinney Act creates a property right inuring to the benefit of the applicant, and HHS therefore cannot deprive the applicant of the property at the financial phase without due process.  (ECF No. 28 at 17–19.)  *See also* U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").  As far as the process HHS should have provided, the Coalition only challenges "[t]he failure of HHS to grant a review of its decision."  (ECF No. 28 at 19.)  It is not clear whether this refers to denial of reconsideration or lack of an administrative appeal process.

The Court is skeptical that APA-reviewable agency action can be independently challenged under the Fifth Amendment due process clause.  A procedural due process argument necessarily claims that the agency should have provided more process than it did, such as an opportunity to examine witnesses, a right to appeal, and so forth.  *See, e.g.*, *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1079–80 (D. Colo. 2017).  If this Court could impose such requirements on agencies through the doctrine of procedural due process, it would appear to contradict Supreme Court authority constraining courts' ability to impose such requirements:

> Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.  This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute [governing

> the agency's action].  But such circumstances, if they exist, are extremely rare.

> * * *

> Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524, 543 (1978) (internal quotation marks omitted).  This language strongly suggests that APA review *is* the "process" to which one is "due" if aggrieved by an agency decision.  Thus, if there is any relief to be had by way of imposing additional procedures, it would be an "extremely rare" case, but nonetheless a case brought *under the APA*.

The Court need not definitively resolve this issue here.  The first step in any procedural due process analysis is to determine "whether there exists a liberty or property interest which has been interfered with by the State."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  Tenth Circuit precedent makes clear that eligibility to *apply* for a government benefit does not create a property interest in the benefit.  *See Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1180–81 (10th Cir. 2016); *Teigen v. Renfrow*, 511 F.3d 1072, 1080–81 (10th Cir. 2007); *cf. Lyng v. Payne*, 476 U.S. 926, 942 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment.").  Even "preliminary approval" is "not enough" to create a property interest.  *Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs of Cnty. of Arapahoe, Colo.*,

633 F.3d 1022, 1031 (10th Cir. 2011).  Thus, the Coalition did not obtain any property interest when HHS approved the first part of the Coalition's application.  For this reason alone, the Coalition's procedural due process argument fails, regardless of whether it is properly joined with an APA argument.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The March 23, 2018 and April 3, 2018 agency decisions are AFFIRMED;

2.    The Clerk shall enter judgment in favor of Defendants and against Plaintiff, and shall terminate this case; and

3.    The parties shall bear their own attorneys' fees and costs.

Dated this 1st day of July, 2019.

BY THE COURT:

William J. Martinez
United States District Judge